**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| US FERTILITY, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BLAKE MASSARO and<br>SPRING FERTILITY, LLC,<br><br>Defendants. | ) | Case No. 26-cv-06883<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED COMPLAINT

Plaintiff US Fertility, LLC, ("US Fertility" or "USF"), by and through undersigned counsel, Eckert Seamans Cherin & Mellott, LLC, as and for its Complaint (the "Complaint") against Blake Massaro ("Massaro") and Spring Fertility, LLC ("Spring Fertility"), (collectively "Defendants"), respectfully allege the following:

## INTRODUCTION

1. The U.S. fertility industry is a competitive and fast-growing medical market driven by specialized fertility clinics and rising demand. The fertility and reproductive health sectors have seen dynamic growth in recent years, driven by shifting demographics, evolving societal attitudes and rapid technological advancement. The fertility market encompasses a range of services, including in vitro fertilization ("IVF"), egg and sperm donation, surrogacy, genetic counseling and fertility preservation.

2. US Fertility is the nation's largest partnership of physician-owned and physician-led fertility practices, along with Ovation Fertility, a national network of premier IVF laboratories.

To date, US Fertility and Ovation Fertility practices have helped approximately 300,000 individuals and couples build their families using assisted reproductive technology.

3. Referrals are critical for fertility practices. Physician referrals are responsible for the lion's share of new patients—as much as 60% of reproductive endocrinology and infertility patients originate from physician referrals. In fact, many managed care and HMO insurance companies require a formal referral from a primary provider or OB/GYN before covering costly specialist evaluations or assisted reproductive technologies.

4. As a result, US Fertility spends considerable time and resources in marketing and developing extensive referral networks through a variety of means. Efforts to build and enhance these networks include tracking referral data, developing practice-specific marketing materials, sponsoring and hosting events that build and expand referral relationships, as well as providing steady, consistent outreach to referring physicians and practices.

5. US Fertility creates and relies upon proprietary information constituting trade secrets in support of its extensive marketing efforts, which results in competitive advantages over vying fertility service providers. Misappropriation of US Fertility's trade secrets undermines and hinders US Fertility's marketing efforts and adversely impacts its relationship with its managed fertility clinics.

6. This case involves the misappropriation of US Fertility's trade secrets by a former employee, Blake Massaro, for the benefit of her new employer, Spring Fertility, a direct competitor of US Fertility. Massaro, who had no prior experience in the fertility industry, was hired by US Fertility as a Practice Liaison to focus on marketing and developing business in the New York City market. She received extensive training from US Fertility on the fertility industry and was given access to US Fertility's confidential, proprietary information. US Fertility goes to great length in

protecting its trade secrets by, *inter alia*, restricting access to its proprietary information and requiring its marketing employees to sign Non-Disclosure Agreements. However, in direct violation of her Non-Disclosure Agreement, as well as other US Fertility policies which she expressly acknowledged, Massaro accessed highly sensitive US Fertility documents unrelated to her job performance, and in many instances, emailed those documents to her personal email (which she has acknowledged doing). Massaro subsequently attempted to cover her tracks by "double deleting" those emails from her US Fertility email account.

7. Based on undisputed findings and by her conduct, Massaro knowingly acquired, copied, retained, disclosed, and used US Fertility's confidential and proprietary business information without US Fertility's consent. She forwarded confidential US Fertility documents to her personal email account and, while interviewing for and after accepting a competing position with Spring Fertility, repeatedly accessed highly sensitive US Fertility information that she had no legitimate need to access, including after she had given notice of her intent to resign. She then sought to conceal her conduct by deleting those communications, all to the benefit of a direct competitor. Any assertion by Massaro that she accessed these materials in the ordinary course of performing her job cannot be reconciled with her own records, which show that she logged no field visits and performed no territory work during the final week of her employment, when much of that access occurred.

8. Just over two months after starting with US Fertility, Spring Fertility solicited Massaro for the position of Physician Liaison and Community Manager. Massaro acceded to Spring Fertility's advances and agreed to interview for the position. While interviewing with Spring Fertility, she repeatedly accessed confidential US Fertility documents unrelated to her duties at US Fertility. In fact, she accessed highly sensitive documents after accepting a position

with Spring Fertility, including on the very day she gave notice of her intent to resign to join Spring Fertility. To make matters worse, Massaro accessed Spring Fertility websites from her US Fertility computer shortly after accessing confidential US Fertility documents.

9. Massaro was employed by US Fertility for just over three months before she abruptly resigned and joined Spring Fertility. Her resignation from US Fertility came less than four weeks after she completed her training with US Fertility. Beyond the loss of its training investment, as a result of Massaro's abrupt departure, US Fertility unknowingly trained a direct competitor to operate against it in US Fertility's own market. The proprietary knowledge and trade secrets Massaro acquired will make her a materially more effective competitor for Spring Fertility than her prior experience alone ever could, and Spring Fertility now stands to improperly capitalize on that proprietary training and information.

10. Massaro breached the terms of her Non-Disclosure Agreement with US Fertility, violated US Fertility policy, violated her duty of loyalty to US Fertility, and misappropriated US Fertility trade secrets for the benefit of her new employer, Spring Fertility. The misappropriated information, which is carefully guarded from public disclosure by US Fertility, will provide Spring Fertility with a competitive advantage in the New York City fertility market. The nature of Massaro's work with Spring Fertility, which will be performed in the same market as where she worked for US Fertility, makes it inevitable Massaro will rely on and/or disclose US Fertility's trade secrets. Massaro and Spring Fertility's unfair business practices, if permitted to continue, will cause irreparable harm to US Fertility.

**THE PARTIES**

11. Plaintiff, US Fertility, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Rockville, MD.

12. Defendant, Blake Massaro is an individual who was formerly employed by US Fertility. Upon information and belief, Massaro resides at 208 W 23rd Street # 717, New York, NY 10011.

13. Defendant, Spring Fertility, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in San Francisco, California.

**JURISDICTION AND VENUE**

14. This Court maintains subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because US Fertility asserts a claim under the Federal Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1836, *et seq*.

15. This Court has supplemental jurisdiction over US Fertility's pendent state law claims pursuant to 28 U.S.C. § 1367 because the state law claims derive from a common nucleus of operative facts and are so related to the federal law claims that they form part of the same case or controversy.

16. Defendant Blake Massaro is an individual residing in New York, New York and is subject to personal jurisdiction in this judicial district.

17. This Court has personal jurisdiction over Defendant Spring Fertility, LLC because the claims asserted herein arise out of and relate to Spring Fertility's purposeful activities within this judicial district, including transacting business, contracting to supply goods or services, and committing the tortious acts alleged herein within this judicial district.

18. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 (b)(2) because a substantial part of the events giving rise to this proceeding occurred in this district.

**FACTS**

19. US Fertility is the nation's largest partnership of physician-owned and physician-led top-tier fertility practices. US Fertility's mission is to deliver the joy of parenthood through advanced reproductive medicine and innovative science. US Fertility supports over 200 physicians by leveraging collective expertise, driving innovation, and by providing advanced business and digital solutions that streamline and enhance the delivery of exceptional patient care. Together with a growing suite of life science services, US Fertility is expanding access to the highest quality reproductive health care across over 135 clinic locations and 32 IVF laboratories.

20. US Fertility operates under a physician-led model where care is centered around reproductive endocrinologists who maintain ownership stakes, aligning clinical quality with organizational growth. US Fertility combines over 200 physicians across more than 135 clinic locations to share clinical data, standardize lab protocols, and pool marketing clout. US Fertility maintains a competitive advantage over other fertility service providers as a result of its shared technological infrastructure, centralized business optimization and common marketing strategies.

21. By contrast, Spring Fertility lists fewer than 30 physician fertility specialists on its website (https://springfertility.com/team/) at nine clinic locations.

22. Reproductive Medicine Associates of New York, LLP ("RMA") is a US Fertility managed fertility practice.

23. Massaro was hired by US Fertility on March 23, 2026, as a Practice Liaison focused on RMA's New York Downtown office located at 594 Broadway, Suite 1101, New York, NY 10012, but who worked across RMA of New York's entire region and had access to RMA's

physicians and referral relationships throughout its Manhattan (Downtown/SoHo, Midtown, and Midtown West), Brooklyn, Westchester, and Long Island locations.

24. At US Fertility, the Practice Liaison represents US Fertility to the referring physician community and to the public. The role of this position is to help grow new patient volume through various marketing channels including, maintaining and enhancing current referral relationships and developing new referring physician relationships, patient education, direct mail, and advertising. The Practice Liaison works closely with the physicians at US Fertility to facilitate networking opportunities to the referral community and keeps US Fertility physicians abreast of changes or opportunities in the marketplace. In addition, the Practice Liaison facilitates communications between the marketing department and US Fertility treatment clinics. The Practice Liaison also coordinates with various departments to enhance customer service or communications. The Practice Liaison works directly with US Fertility's physicians and external providers to develop and implement effective marketing strategies and develop and maintain effective referral relationships and new patient volume. US Fertility measures and compensates a Practice Liaison based on targets assigned by region and office, not by individual referring physician, and those targets are broken into quarterly increments. A Practice Liaison's performance and incentive compensation are based on her own scheduled visits and the referral activity of her own assigned referring physicians. While those individual targets are derived in part from practice-level goals, the Practice Liaison role does not require, and a Practice Liaison does not need, the practice's new patient visit ("NPV") goals, retrieval goals, or per-physician annual goals in order to perform her duties or earn her incentive compensation. US Fertility's own field sales trainers do not reference or use per-physician goals in training field personnel or in managing their own

territories. Per-physician annual goals and practice-level NPV and retrieval figures are therefore outside the scope of, and unnecessary to, the Practice Liaison role.

25. US Fertility is the developer and owner of all confidential, proprietary information and trade secrets described herein accessed by Massaro in her role as Practice Liaison with RMA.

26. Because the Practice Liaison is given access to US Fertility trade secrets, Massaro was required to maintain and protect operations and sensitive business data by keeping all pertinent information confidential.

27. Prior to her employment with US Fertility, Massaro did not have any experience in the fertility industry. As a result, US Fertility was required to provide Massaro with extensive training on the fertility industry, in general, and the New York City market, specifically.

28. Massaro completed a comprehensive onboarding and training program designed to introduce her to the organization, the fertility patient journey, referral development, and the day-to-day responsibilities of managing a territory. Her training combined structured learning modules, systems education, data and reporting instruction, clinical exposure, field shadowing, mentoring, external professional development, and ongoing coaching.

29. Massaro also received hands-on Salesforce (US Fertility's Customer Relationship Management Platform software) instruction while shadowing experienced team members. She observed firsthand how US Fertility's field activity, relationship history, follow-up needs, and competitive intelligence is documented and used to guide future outreach. Massaro's field training was led by several of US Fertility's most senior field sales leaders and covered account targeting and routing, use of Salesforce and Power BI software (US Fertility's business intelligence tool), historical referral-data analysis, competitive analysis, and proprietary sales techniques. Massaro

was also trained on Phreesia, a third-party proprietary data channel used by US Fertility for referral and patient-source reporting.

30. US Fertility's referral analytics and market intelligence derive much of their value from the depth and exclusivity of the underlying data. RMA was founded approximately twenty-five years ago, and US Fertility’s referring-physician data, referral-trend analysis, and market intelligence for the New York market are built upon roughly twenty-five years of proprietary, practice-specific data that no competitor possesses. By contrast, Spring Fertility did not enter the New York market until approximately 2021, roughly five years ago. Spring Fertility cannot replicate twenty-five years of longitudinal referral data and market intelligence, and US Fertility’s data therefore affords a competitive advantage that a recent market entrant cannot obtain through legitimate means.

31. US Fertility has also invested millions of dollars and years of specialized effort to build the technology infrastructure that stores, integrates, and analyzes this data. Its Salesforce customer-relationship-management system is extensively customized to US Fertility's business at substantial expense, in both direct system costs and technical expertise. US Fertility field sales representatives document competitive intelligence and physician relationship history in Salesforce as part of their daily work. That combined historical field intelligence is a proprietary dataset, built over years across the network, that no competitor can reconstruct.

32. US Fertility engaged outside data engineers to design and build a proprietary data lake and data warehouse, a build that required approximately two years to complete, which feeds US Fertility's Power BI reporting environment. A dedicated in-house business-intelligence team continuously develops and refines the Power BI dashboards and reports, which depend on the

Salesforce customization, to generate proprietary business-intelligence views that are not available to competitors and that US Fertility continues to build and expand.

33. Because US Fertility draws on approximately twenty-five years of experience in the New York market, together with field-sales operational data and commercial best practices generated by its thirty-four field sales representatives across its national network, US Fertility has developed what it believes to be the most powerful and proprietary set of field-sales data in the U.S. fertility industry, and perhaps anywhere. This combination of longitudinal market data, national field-sales intelligence, and custom-built analytics infrastructure is a core competitive differentiator that cannot be duplicated without access to US Fertility's confidential and proprietary information.

34. In addition, Massaro completed numerous in-person and "shadow" days with US Fertility's New York-based field sales team and its most senior field sales representatives, and shadowed RMA of New York physicians to observe the patient experience firsthand. She also received individualized coaching from a US Fertility organizational PhD psychologist retained for her proprietary selling techniques, training that US Fertility has curated over many years and that is not available "off the shelf."

35. Massaro was trained to use data to prioritize outreach and make informed territory decisions. She reviewed physician and practice referral trends, top referring practices, new-patient activity, and gainers and decliners within the New York City market. Massaro received initial territory reports and reviewed the information with the appropriate reporting partners to understand how the data should influence account prioritization, routing, and follow-up.

36. The referral data reports Massaro was trained on, covering physician and practice referral trends, top referring practices, and new-patient activity, represent the accumulation of

many years of data gathered from the field, US Fertility's new-patient call center, and US Fertility's commercial operations team. Together, they capture where US Fertility patients come from, which physicians refer into US Fertility's practices, and how those referral patterns move over time. They also reflect what US Fertility has learned about the likelihood that a referred patient will schedule an appointment, keep that appointment, and convert to treatment, as well as payor mix by referring physician. The value of this data is not in the raw figures but in what US Fertility does with them: the data and figures are run through US Fertility's business-intelligence tools to build a targeted call plan that tells each field representative which specific physicians to call on, and how often, in order to optimize referrals and, ultimately, treatment conversions. No competitor can reconstruct this without US Fertility's underlying data and analytics.

37. The selling techniques Massaro was taught are similarly proprietary. They are built on best practices developed over the cumulative experience of the US Fertility practices, all of which were founded between twenty-five and thirty years ago and refined by a management team US Fertility recruited specifically for its expertise in managing field sales. US Fertility is also the only fertility group that engages a PhD psychologist to train its field team, helping members of the field team deliver a high level of customer service and hospitality, understand the unique psychology of the fertility patient, and improve field-sales performance. This combination of long-tenured institutional experience, purpose-built management, and specialized behavioral training is not something a competitor such as Spring Fertility can obtain off the shelf.

38. Massaro also received extensive training focused on understanding and organizing the New York City market. She reviewed office locations, physicians, priority referral sources, existing relationships, competitive dynamics, and historical referral performance. This information

was developed by US Fertility over a period of many years based on its significant innovative developments in the fertility industry.

39. In all, Massaro's training by US Fertility spanned nearly two months and exposed her to valuable trade secrets upon which US Fertility built a fertility practice with the highest overall patient volumes and cumulative births in the United States.

40. Throughout her employment with US Fertility, including her training and her time in the field, US Fertility provided Massaro access to non-public information concerning US Fertility's referral network and proprietary sales information and techniques — including confidential budgets, client playbook, and operational data — to enable Massaro to perform her job as Practice Liaison.

41. Massaro's employment with US Fertility was conditioned upon execution by Massaro of US Fertility's Non-Disclosure Agreement (the "Agreement"), which she signed on March 13, 2026. A copy of the Non-Disclosure Agreement is attached hereto as Exhibit A.

42. Under the terms of the Agreement, Massaro was expressly prohibited from:

> Disclos[ing] to others or use for my own benefit, either during or after my engagement by the Company or the above entity, any confidential business, commercial, scientific and/or technical information pertaining to the Company or its clients, customers, consultants, licenses or affiliates, which is acquired by me during the period of my engagement, unless such disclosure or use is necessary in the ordinary course of performing my duties for the Company, or unless I have obtained the Company's express written consent.

Exhibit A, p. 1 (emphasis in original).

43. Pursuant to the Agreement, Massaro was required to return all US Fertility materials upon the termination of her employment:

> Promptly after the termination of my or my employer's engagement with the Company or the termination of my employment by an entity which has been engaged by the Company or the termination of my employment by an entity which has been engaged by the Company (whichever happens first), I will deliver to the

> Company and will not take with me all originals and reproductions of all materials of any nature pertaining to Inventions and to my work with the Company.

*Id.*

44. Pursuant to the Agreement, Massaro also agreed that:

> Any breach of this Agreement by me could cause irreparable damage to the Company, and in the event of such breach the Company shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any of my obligations hereunder.

*Id.*

45. Massaro's employment with US Fertility was also conditioned upon acceptance of the terms set forth in US Fertility's Employee Handbook (the "Employee Handbook"), which Massaro acknowledged on March 13, 2026. A copy of the Handbook is attached hereto as Exhibit B.

46. The Employee Handbook strictly prohibits:

a. Theft or unauthorized removal of property from Company premises;

b. Possessing confidential information without authorization;

c. Failing to maintain confidential information or trade secrets or engaging in direct competition with the Company;

d. Disclosing and/or misusing confidential or proprietary information; and

e. Engaging in activities that create a conflict of interest.

Exhibit B, pp. 15-17, 21-23, 3-32.

47. Massaro's employment with US Fertility was also conditioned upon acceptance of the terms set forth in US Fertility's Acceptable Use Policy for USF End Users (the "Acceptable Use Policy"), which Massaro acknowledged on March 13, 2026. A copy of the Acceptable Use Policy is attached hereto as Exhibit C.

48. The Acceptable Use Policy strictly prohibits:

a. Storing US Fertility data on any non-authorized USF equipment;

b. Giving or transferring USF data or software to any person or organization outside USF without the authority of USF; and

c. Forwarding USF mail to personal (non-USF) email accounts.

Exhibit C, pp. 1-2.

49. US Fertility disclosed the information described in the foregoing paragraphs to Massaro only subject to the above provisions in the Agreement, Handbook and Acceptable Use Policy.

50. Access to US Fertility trade secrets described herein is subject to password protection and all such confidential information is maintained on company-owned servers and secure cloud-hosting systems.

51. Notwithstanding her obligations under the Agreement, Employee Handbook, and Acceptable Use Policy, Massaro repeatedly accessed information unrelated to her job duties.

52. Massaro also emailed confidential, proprietary information from her RMA account to her personal email account including US Fertility's sales playbook, US Fertility budgets, and sales training materials. Moreover, she attempted to cover her tracks (unsuccessfully) by "double deleting" from her US Fertility (RMA) account the items she had sent to her personal email. The misappropriation began just weeks after she joined US Fertility.

53. On April 8, 2026, Massaro sent an email from her RMA account to her personal email attaching US Fertility's PD Training Modules. This email was subsequently "double deleted" from her RMA account.

54. On April 27, 2026, Massaro signed a non-employee talent release authorizing Spring Fertility to feature her in a patient marketing campaign. Spring Fertility solicited Massaro for employment shortly thereafter; she did not seek out Spring Fertility on her own.

55. In addition to Massaro, Spring Fertility solicited another US Fertility field sales representative in or around the spring of 2026, but the representative declined an offer from Spring Fertility.

56. Upon information and belief, Spring Fertility contacted Massaro in or about May 2026 to interview for a position in Spring Fertility's New York City office.

57. On May 18, 2026, Massaro initiated a OneNote file entitled "SPRING.one" in preparation for interviewing with Spring Fertility noting, "[t]he only reason this conversation is happening is because Dr. Kolbe Hancock…reached out and encouraged me to explore the role at Spring." Dr. Hancock is a fertility specialist in Spring Fertility's New York office. Massaro created multiple notes to herself in OneNote to prepare for her interview with Spring Fertility.

58. On that same day, May 18, 2026, Massaro accessed certain sensitive documents on US Fertility's SharePoint sites for the first time. These SharePoint sites house some of US Fertility's most sensitive proprietary materials, including itemized physician and practice budgets, proprietary selling techniques and training, and business-intelligence analyses identifying which referring physicians increased or decreased their referrals over time, together with the field playbook identifying which referral sources to visit and how frequently in order to optimize referrals.

59. Massaro frequently visited "SPRING.one" just minutes after accessing US Fertility documents. Massaro edited "SPRING.one" multiple times between May 18, 2026, and May 28, 2026, often in close proximity to accessing confidential US Fertility documents such as US Fertility's onboarding document on May 18, 2026, and RMA's Physician Referral List on May 21, 2026.

60. In all, Massaro visited "SPRING.one" and accessed Spring Fertility's SharePoint site 258 times over a two-week period leading up to her in-person interview with Spring Fertility on or about June 3, 2026.

61. On June 8, 2026, Massaro sent an email from her RMA account to her personal email attaching NPV goals of all RMA physicians and a document entitled "Key Field Sales Questions." This email was subsequently "double deleted" from her RMA account. Massaro had no legitimate business reason to send the per-physician NPV goals of all RMA physicians to her personal email account. As set forth above, those figures are unnecessary in performing the Practice Liaison role; the only plausible purpose for transmitting the per-physician figures to her personal account was to benefit a competitor. The accompanying document entitled "Key Field Sales Questions" was first accessed on June 8, 2026, and was copied directly from US Fertility's proprietary training module entitled "Module 8: Setting Up Your Territory," on which US Fertility had trained Massaro on April 29, 2026. Its creation and transmission on June 8 bore no relationship to any training then underway and reflect Massaro's appropriation of US Fertility's proprietary training content for her own use.

62. In the days leading up to her resignation, she accessed confidential itemized budget reports, talking points for marketable deliverables, and US Fertility's referring physician goals.

63. On June 23, 2026, the day before she gave notice of her intent to resign, Massaro accessed a US Fertility document entitled "US Fertility 2026 Scheduling and Referring Physician Goals." There was no reason for Massaro to access this confidential document; it was unrelated to the performance of her job duties. On the same day, June 23, 2026, Massaro also accessed a US Fertility document entitled "2026 Scheduling - Referring MD Goals," another confidential document unrelated to the performance of her job duties. A forensic review confirmed that Massaro

accessed the “Scheduling and Referring Physician Goals” file five times between May 20 and June 23, 2026, and accessed the “2026 Scheduling - Referring MD Goals” file a single time, on June 23, 2026.

64. Days earlier, on June 21, 2026, US Fertility conducted Massaro’s 90-day performance check-in, led by her direct manager, Maria Bryan, during which Massaro represented that she was happy in her role at US Fertility. However, just three days later on June 24, 2026, Massaro requested a meeting with Ms. Bryan, at 12:05 p.m. and, when they spoke at 1:25 p.m., gave notice of her intent to resign to accept an offer from Spring Fertility, a direct competitor. Following that discussion, at 4:17 p.m. on that same day, Massaro accessed two confidential US Fertility documents entitled “Gains and Declines Best Practices and How to Optimize” and “RMA Only Gains and Declines.” These documents summarize top RMA referral practices and strategies for field activity targets. Massaro had no legitimate business reason for accessing either document, particularly in light of the fact that she had just given US Fertility notice of her intent to resign to join a direct competitor. Forensic review confirmed the significance of this timing: Massaro first accessed “Gains and Declines Best Practices and How to Optimize” on June 12, 2026, and accessed it a total of nine times through June 24, 2026, and she accessed the “RMA Only Gains and Declines” report, a Power BI file, only once ever, at 4:17 p.m. on June 24, 2026, hours after giving notice of her intent to resign.

65. On June 25, 2026, in an attempt to retain Massaro, US Fertility provided Massaro with a counteroffer that matched the compensation offered by Spring Fertility. This retention offer was extended prior to US Fertility becoming aware of Massaro’s inappropriate actions and violations of her non-disclosure agreement. The counteroffer was declined.

66. On June 26, 2026, Massaro submitted a formal resignation letter and her computer access with US Fertility was disabled.

67. Following her resignation, US Fertility conducted a review of Massaro's computer and email activity. US Fertility's review revealed the full extent of Massaro's misappropriation. Massaro's own field records confirm that these accesses were unrelated to the performance of her job. According to Massaro's field-activity records, her last recorded field activity occurred on June 17, 2026, and she logged no field visits, physician lunches, or other territory work during the final week of her employment, even as she accessed US Fertility's most sensitive proprietary documents between June 19 and June 24, 2026. By that time Massaro had effectively ceased performing her territory duties and was preparing to resign, and her document accesses during that period cannot be reconciled with any legitimate performance of her role. Massaro also maintained her field-visit notes in a personal spreadsheet rather than recording them in US Fertility's Salesforce system as required, retaining US Fertility's field-activity information outside of US Fertility's systems.

68. On numerous occasions, Massaro accessed "SPRING.one" just minutes after viewing US Fertility's Onboarding, Field Visits and Training documents. On June 3, 2026, alone, Massaro accessed "SPRING.one" forty-nine times.

69. Massaro also accessed Spring Fertility's websites, including SharePoint (springfertility.sharepoint.com) and Salesforce (springfertility.my.site.com), from her US Fertility computer on multiple occasions, often close in time to working with US Fertility's proprietary documents and files. Upon information and belief, Spring Fertility's Salesforce surface may be a patient portal (Massaro is a former Spring Fertility patient). However, there would be no reason for Massaro to access Spring Fertility's SharePoint site from her US Fertility computer.

70. Massaro's LinkedIn page indicates that she is currently employed as a Physician Liaison and Community Manager at Spring Fertility.

71. Spring Fertility's job posting[1] for Physician Liaison and Community Manager described the position as follows:

> The Physician Liaison and Community Manager is responsible for implementing initiatives designed to facilitate the development of relationships between Spring Fertility physicians and referring physicians, medical practice groups, supplementary wellness providers, and community partners in order to increase referral volume. We are looking for a get-it-done person with excellent interpersonal skills and a keen attention to detail. This person is a creative but metrics-driven individual with an understanding of relationship building and event management best practices. The primary responsibility is establishing and maintaining positive, effective relationships and ongoing communications with physicians and medical practice groups.
>
> Day-to-day duties include:
>
> - Physician outreach and relationship development
> - Positioning Spring Fertility as a leader in fertility care
> - Introducing new Spring Fertility physicians to the market
> - Make regular contact (via in-person meetings, telephone, email or other channels) with existing network of referring physicians, office managers, community grand rounds coordinators and other staff to build relationships necessary to drive referral patient volume
> - Develop and foster new relationships with prospective accounts
> - Report weekly on referral volume by channel, tracking activity and effectiveness of outreach
> - Coordinate patient- and prospective patient-facing events to drive brand awareness, including but not limited to in-house informational sessions, community events, events/conferences, etc.
> - Maintain outreach schedule for Spring Fertility physicians in the community
> - Work closely with Marketing to develop collateral to support outreach

[1] https://jobs.inwomenshealth.com/companies/spring-fertility-2/jobs/77049102-physician-liaison-and-community-manager (last visited August 11, 2026).

72. The nature of Massaro's employment with Spring Fertility as a Physician Liaison and Community Manager in the New York City market makes it inevitable that she will rely on or disclose US Fertility's trade secrets if she has not already done so. The role and responsibilities of the Physician Liaison Community Manager position with Spring Fertility are directly related to, and will unquestionably benefit from, the extensive training Massaro received at US Fertility. Moreover, Massaro cannot perform her duties as Physician Liaison Community Manager without calling upon the US Fertility's trade secrets that she misappropriated—the confidential documents and strategies she stole from US Fertility will be an essential aspect of her day-to-day activities for Spring Fertility.

73. On July 3, 2026, counsel for US Fertility sent a letter to Massaro detailing her violations and misconduct which US Fertility unearthed through its investigation and demanded that Massaro return all US Fertility trade secrets. Massaro, through counsel, acknowledged she had emailed confidential information to her Gmail, but claimed she no longer possessed any such information, nor did she provide any proprietary information to Spring Fertility. Massaro also claimed she only accessed confidential US Fertility information to perform her duties as a US Fertility employee, which clearly was not true.

74. On July 6, 2026, counsel for US Fertility sent Spring Fertility a letter summarizing Massaro's illegal conduct and demanded that Spring Fertility provide written assurances, by July 10, 2026, that Spring Fertility did not and does not currently possess any of US Fertility's confidential, proprietary information.

75. Spring Fertility ignored US Fertility's requests altogether and failed to provide any response to the serious concerns raised in the July 6, 2026, letter.

**<u>COUNT ONE – AGAINST DEFENDANTS</u>**
**Violations of Defend Trade Secrets Act,**
**18 U.S.C. § 1836, *et seq.***

76. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

77. The confidential business information accessed and misappropriated by Massaro constitutes US Fertility's protectable trade secrets under 18 U.S.C. § 1839(3), including, but not limited to, referral data and analytics, physician referral histories, marketing strategies, sales playbooks, territory planning materials, budgets, pricing information, training materials, customer relationship information, and other proprietary business information that derives independent economic value from not being generally known or readily ascertainable by competitors.

78. US Fertility took reasonable measures to protect the secrecy of its trade secrets, including requiring employees to acknowledge confidentiality agreements, enforcing policies prohibiting the disclosure or retention of confidential information, restricting access to confidential business information, and providing employees with notice that such information was proprietary and confidential.

79. US Fertility's trade secrets relate to its nationwide fertility services business and are used in interstate commerce.

80. Massaro misappropriated US Fertility's trade secrets by knowingly acquiring, copying, retaining, disclosing, and using US Fertility's confidential and proprietary business information without consent. Among other things, Massaro forwarded confidential documents to her personal email account, accessed highly confidential business information while interviewing for and after accepting employment with Spring Fertility, attempted to conceal her conduct by deleting those communications, and retained or disclosed US Fertility's trade secrets for the benefit

of Spring Fertility. Massaro's and Spring Fertility's misappropriation of US Fertility's trade secrets was willful and malicious.

81. Upon information and belief, Spring Fertility knew or had reason to know that the information was acquired through improper means and nevertheless accepted the benefit of Massaro's misappropriation. Spring Fertility's failure to respond to US Fertility's demand that it return or destroy US Fertility's trade secrets further supports the inference that Spring Fertility continued to retain or benefit from the misappropriated information.

82. Defendants' misappropriation has caused and, absent an injunction, will continue to cause US Fertility irreparable harm, including the loss of confidential business information, competitive advantage, and business opportunities.

83. Pursuant to 18 U.S.C. § 1836(b)(3), US Fertility is entitled to injunctive relief, damages, attorneys' fees, and all other relief available under the DTSA. US Fertility is further entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) because Massaro's misappropriation was willful and malicious.

**COUNT TWO – AGAINST DEFENDANTS**
**Misappropriation of Trade Secrets (Common Law)**

84. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

85. US Fertility's referral analytics data, field sales playbook, sales data and budgets, pricing information, and training materials constitute proprietary and confidential information which cannot be duplicated absent a breach of confidentiality.

86. The data organized and compiled as part of US Fertility's comprehensive referral analytics research represents the product of years of investment, experience, and proprietary analysis. The research captures confidential information concerning physician referral

relationships and fertility market trends that enables US Fertility to evaluate opportunities, strengthen referral networks, and make strategic business decisions. The information is not publicly known and, as such, provides US Fertility with a substantial competitive advantage.

87. Moreover, US Fertility's referral analytics, sales data, budgets, and pricing information is highly valuable to market competitors, such as Spring Fertility, who desire to expand their operations in the New York region and obtain an unfair advantage.

88. US Fertility further protected this information by limiting employee access based on job responsibilities, providing confidential training only to Practice Development personnel, prohibiting employees from forwarding company information to personal email accounts or storing company data on unauthorized devices, and requiring employees to return all confidential materials upon termination of employment.

89. Furthermore, the data is impossible to replicate because it requires the analysis of highly confidential patient data, which is not accessible to outside parties.

90. Despite the safeguards US Fertility employed, including the Agreement, Massaro, in coordination with Spring Fertility, accessed and disclosed confidential and proprietary business information for Spring Fertility's commercial benefit.

91. Defendants' misappropriation has caused and, absent an injunction, will continue to cause US Fertility irreparable harm, including the loss of confidential business information, competitive advantage, and business opportunities.

## <u>COUNT THREE – AGAINST DEFENDANT MASSARO</u>
## Breach of Contract

92. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

93. On March 13, 2026, as a condition of her employment, Massaro executed the Agreement. The Agreement provides that it is governed by Maryland law.

94. The Agreement prohibits Massaro from using, disseminating, or otherwise disclosing confidential business information relating to US Fertility's operations without US Fertility's consent. The Agreement further requires Massaro, upon the termination of her employment, to return all originals and copies of materials relating to her work for US Fertility.

95. Notwithstanding the unambiguous terms of the Agreement and her express acknowledgment of its obligations, Massaro materially breached the Agreement by repeatedly using, disclosing, and retaining US Fertility's highly confidential business information without US Fertility's knowledge or consent.

96. In further breach of the Agreement, Massaro forwarded confidential and proprietary business information from her RMA email account to her personal Gmail account, notwithstanding the Agreement's express prohibition against the unauthorized disclosure and retention of confidential information.

97. Upon information and belief, Massaro accessed Spring Fertility's Microsoft SharePoint and Salesforce environments from her US Fertility computer on multiple occasions while in possession of US Fertility's confidential business information.

98. Collectively, these actions constitute a material breach of the Agreement.

99. As a direct and proximate result of Massaro's breaches of the Agreement, US Fertility has suffered damages, including the loss of confidential business information, the loss of its competitive advantage, and other damages in an amount to be determined at trial.

**COUNT FOUR – AGAINST DEFENDANT MASSARO**
**Breach of the Duty of Loyalty**

100. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

101. At all relevant times, Massaro owed US Fertility a duty of good faith and loyalty arising from her employment as a Practice Liaison.

102. That duty required Massaro to act in US Fertility's best interests during the course of her employment and prohibited her from misusing or disclosing US Fertility's confidential and proprietary business information for her own benefit or the benefit of a competitor.

103. During her employment, Massaro was entrusted with access to US Fertility's confidential and proprietary business information solely for purposes of performing her assigned job responsibilities.

104. Rather than acting for the benefit of US Fertility, Massaro improperly accessed confidential information outside the scope of her job responsibilities, forwarded US Fertility's confidential and proprietary information to her personal email account, reviewed confidential documents before interviewing with Spring Fertility, and disclosed and/or transferred confidential business information for the benefit of Spring Fertility while she remained employed by US Fertility.

105. Massaro's conduct was directly adverse to US Fertility's interests and constituted a breach of the duty of loyalty she owed to US Fertility.

106. As a direct and proximate result of Massaro's breach of the duty of loyalty, US Fertility has suffered, and continues to suffer, damages, including the loss of the confidentiality of its proprietary business information, impairment of its competitive advantage, and other damages to be proven at trial.

**COUNT FIVE – AGAINST DEFENDANTS**
**Unfair Competition**

107. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

108. US Fertility is the largest physician-led fertility network in the United States. It has a network of over two hundred physicians and over 135 clinic locations. According to recent data, it also has one of the highest IVF success rates of all fertility clinics nationwide. There are fourteen US Fertility clinic offices in the New York metropolitan area alone, three of which are located in Manhattan.

109. To maintain its competitive advantage, the Practice Development team develops and maintains confidential referral analytics, marketing strategies, sales data, budgets, pricing information, training materials, and other proprietary business information. These materials are developed through substantial time, effort, and expense and provide US Fertility with a significant competitive advantage within the fertility services industry.

110. Through the conduct described above, Massaro knowingly acquired, disclosed, retained, and used US Fertility's confidential and proprietary business information for her own benefit and for the benefit of Spring Fertility.

111. Upon information and belief, Spring Fertility knowingly encouraged Massaro to retain US Fertility's confidential business information and knowingly benefited and benefits from that information in order to compete unfairly with US Fertility.

112. By misappropriating US Fertility's substantial investment in developing its confidential business information and referral network, Defendants engaged in unfair competition under New York law.

113. As a direct and proximate result of Defendants' conduct, US Fertility has suffered damages, including the loss of confidential information, competitive advantage, business opportunities, profits, and market share, in an amount to be determined at trial.

**COUNT SIX – AGAINST DEFENDANTS**
**Tortious Interference with Prospective Business Relations**

114. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

115. US Fertility has existing and prospective business relationships with physicians and medical practices throughout its physician referral network in New York.

116. Throughout her training and employment with US Fertility, Massaro gained access to physician referral documents and was trained to use US Fertility's proprietary referral analytics to maintain referral relationships and make informed territory decisions.

117. Upon information and belief, Defendants knowingly and intentionally used US Fertility's confidential and proprietary business information to solicit and divert referral sources and prospective business opportunities for Spring Fertility's benefit.

118. Defendants accomplished this interference through wrongful means, including the misappropriation and unauthorized use of US Fertility's confidential and proprietary business information in violation of Massaro's contractual obligations under the Agreement.

119. As a direct and proximate result of Defendants' conduct, US Fertility has suffered damages, including the loss of prospective business opportunities, referral relationships, goodwill, and profits, in an amount to be determined at trial.

**COUNT SEVEN – AGAINST DEFENDANTS**
**Conversion**

120. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

121. At all relevant times, US Fertility had a lawful ownership interest and an immediate superior right of possession to the confidential, proprietary information and trade secrets described herein (the "Subject Property").

122. Defendants intentionally and without authorization took, assumed, and exercised dominion and control over the Subject Property.

123. Defendants' exercise of control over the Subject Property was entirely inconsistent with and in derogation of US Fertility's superior right of possession.

124. On or about July 3, 2026, and July 6, 2026, US Fertility demanded that Defendants return and surrender the Subject Property to US Fertility.

125. Defendants failed and refused, and continue to fail and refuse, to return the Subject Property to US Fertility.

126. As a direct and proximate result of Defendants' conversion, US Fertility has been harmed and is entitled to compensatory damages, plus statutory interest from the date of the conversion.

**COUNT EIGHT – AGAINST DEFENDANTS**
**Unjust Enrichment**

127. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

128. US Fertility alleges in the alternative to its breach of contract claim, that US Fertility is entitled to recover under the doctrine of unjust enrichment if it is determined that either

a valid and enforceable contract does not exist between US Fertility and Massaro, the existing contract does not cover the subject matter of the dispute between US Fertility and Massaro, or the existing contract between US Fertility and Massaro is void, invalid, or unenforceable.

129. There is no contract between US Fertility and Spring Fertility that covers the subject matter of this dispute.

130. US Fertility provided to Massaro access to the Subject Property which, as detailed herein, has significant value.

131. Massaro was enriched by virtue of US Fertility providing her access to the Subject Property.

132. Defendants have been unjustly enriched as a result of their possession and use of the Subject Property.

133. Defendants were aware and had knowledge that US Fertility was not providing the Subject Property gratuitously and that the Subject Property has monetary value.

134. US Fertility has demanded that Defendants return to US Fertility the Subject Property, but Defendants have failed to do so.

135. Defendants have accepted and retained the Subject Property inequitably and at US Fertility's expense.

136. US Fertility and Massaro had a sufficiently close relationship or connection as to cause reliance or inducement by US Fertility.

137. As a result of Defendants' retention of the Subject Property, US Fertility has suffered and/or will suffer damages, including the loss of prospective business opportunities, referral relationships, goodwill, and profits, in an amount to be determined at trial.

138. For all the reasons set forth herein, it is against equity and good conscience to permit Defendants to retain the Subject Property to which US Fertility provided Massaro access.

**WHEREFORE,** Plaintiff US Fertility demands judgment against Massaro and Spring Fertility and requests that this Court:

a. Award Plaintiff preliminary and permanent injunctive relief enjoining Defendants from using, disclosing, retaining, or otherwise misappropriating Plaintiff's trade secrets and confidential business information, and requiring Defendants to destroy all copies of such information in their possession, custody, or control;

b. Award Plaintiff injunctive relief barring Massaro for six months from serving as a physician liaison or in a comparable referral-development role for Spring Fertility in the New York metropolitan area to prevent further misappropriation of US Fertility's trade secrets;

c. Award Plaintiff compensatory damages in an amount to be determined at trial;

d. Award Plaintiff punitive and exemplary damages, including exemplary damages under 18 U.S.C. § 1836(b)(3)(C) for Defendants' willful and malicious misappropriation of US Fertility's trade secrets, in an amount up to twice the amount of any compensatory damages awarded;

e. Award Plaintiff all profits or other benefits unjustly obtained by Defendants as a result of their wrongful conduct, to the extent permitted by law;

f. Order disgorgement of all compensation paid to Massaro by US Fertility for the period of time where Massaro was disloyal;

g. Award Plaintiff its costs, attorneys' fees where authorized by law;

h. Award Plaintiff any other monetary or equitable relief to which it is entitled; and

i. Grant such other and further relief as the Court deems just and proper.

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**

Dated: August 12, 2026

By: */s/ Nicholas J. Schneider*

Nicholas J. Schneider, Esq.
Two International Place, 16th Floor
Boston, MA 02110
nschneider@eckertseamans.com
(617) 342-6800

Mark A. Johnston, Esq.
*pro-hac vice application forthcoming*
1717 Pennsylvania Avenue, N.W., Suite 1200
Washington, DC 20006
mjohnston@eckertseamans.com
(202) 659–6600

*Attorneys for US Fertility, LLC*

**JURY DEMAND**

Plaintiff, US Fertility, LLC hereby demands a jury trial on all issues which are triable to a jury raised herein.

By: *s/ Nicholas J. Schneider*
Nicholas J. Schneider

# VERIFICATION

I, Jaime Shamonki, MD, am the Chief Operating Officer of US Fertility, LLC in the case captioned *US Fertility, LLC v. Blake Massaro and Spring Fertility, LLC,* and have authorized the filing of this Verified Complaint.

1. I have read the foregoing Verified Complaint and know the contents thereof.
2. I have reviewed the allegations made in the Verified Complaint, and to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on information provided to me by US Fertility, LLC employees, as well as US Fertility, LLC business records that I have personally reviewed, and I believe them to be true.
3. I verify under penalty of perjury that the foregoing is true and correct.

Executed on: August 12, 2026

____________________________________
Jaime Shamonki, MD
Chief Operating Officer